# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Gordon Cox, et al.,                            Case No. 3:16CV1826

               Plaintiffs

            v.                                 **ORDER**

State of Ohio, et al.,

               Defendants

This is a civil-rights case under 42 U.S.C. § 1983.

The State of Ohio grants certain operators of natural-gas pipelines the right to exercise the State's eminent-domain power.

In 2012, Ohio exempted these pipeline companies from regulatory scrutiny by the Ohio Power Siting Board. As a result, a company like the defendant, Kinder Morgan Utopia LLC, that intends to build such a pipeline may select the pipeline's route and initiate eminent-domain proceedings to acquire the necessary easements and rights-of-way – all without oversight from any Ohio governmental or regulatory body.

Plaintiffs – three property owners in rural Wood County, Ohio – have received notices from Kinder Morgan that the company intends to acquire, whether by voluntary agreement or a state-court appropriation action, easements across their properties. The plaintiffs, who have refused to grant the easements voluntarily, argue that the delegation of eminent-domain power to Kinder Morgan violates the Due Process Clause of the Fourteenth Amendment.

Pending is the plaintiffs' motion for a temporary restraining order. (Doc. 4).

Because plaintiffs have not shown a substantial likelihood of success on their claim, and also because they have not shown that they are likely to suffer an irreparable injury, I deny the motion.

## Background

### A. The Utopia Pipeline

Kinder Morgan is a private company that builds, operates, and maintains petroleum pipelines. (Doc. 9 at 4). The company alleges it is a common carrier under Ohio and federal law, but the plaintiffs dispute that.[1]

"In response to public need for increased petroleum take-away capacity," Kinder Morgan intends to build the Utopia Pipeline, "an interstate common carrier petroleum pipeline system from Harrison County, Ohio, to connect with existing Kinder Morgan pipeline structure in Fulton County, Ohio." (*Id.* at 3). From there, the pipeline will connect to an international distribution facility in Windsor, Ontario. (*Id.*).

According to Kinder Morgan, the Utopia will: 1) respond to market demand for "additional firm take-away capacity from the Marcellus and Utica shale supply areas" in southeastern Ohio; 2) serve as a "critical junction between sources of hydrocarbon production from the Marcellus and Utica shale supply area and end user markets outside Ohio"; and 3) allow producers to "move their

---

[1] This dispute is not material at this point, but there appears to be little merit to the plaintiffs' argument. *See* O.R.C. § 1723.08 (defining a "common carrier" as a company that "transport[s] . . . natural gas, petroleum, coal or its derivatives"); *Kinder Morgan Cochin, L.L.C. v. Simonson*, --- N.E.3d ----, 2016-Ohio-4647, ¶¶31–35 (Ohio App.) (affirming judgment that Kinder Morgan was, *vis-a-vis* its construction of the Utopia Pipeline, a common carrier under O.R.C. § 1723.08).

2

stranded natural gas liquids to higher demand markets as efficiently and expeditiously as possible[.]" (*Id.* at 4).

Construction is due to begin in November, 2016, and Kinder Morgan hopes to have the pipeline running by January, 2018. *See* Verified Petition and Complaint for Appropriation and Condemnation of Easement Interests in Real Property at ¶16, *Kinder Morgan Utopia LLC v. Cox*, Case No. 2016 CV 462 (Wood County, Ohio) (the State-Court Petition).[2]

### B. Kinder Morgan's Eminent-Domain Power

Since at least 1953, Ohio law has granted certain private companies the right to exercise eminent-domain powers. *See* O.R.C. § 1723.01, *et seq*.

Section 1723.01 grants eminent-domain authority to any company that is "organized for the purpose of . . . transporting natural or artificial gas, petroleum, coal or its derivatives . . . through tubing, pipes, or conduits." Such a company has the right to "appropriate so much of such land, or any right or interest therein, as is deemed necessary for the laying down or building of such tubing, conduits, [or] pipes . . . necessary to the purposes of such companies[.]" O.R.C. § 1723.01.

### 1. Statutory Framework

Section 163.021 states that no "agency"[3] may appropriate real property "except as necessary and for a public use." O.R.C. § 163.021(A).

---

[2] I have taken judicial notice of the allegations in Kinder Morgan's state-court complaint, not for the truth of the matters asserted there, but to help illustrate what this case is about and how it reached this court. *Jergens v. Ohio Dep't of Rehab. & Corrs. Adult Parole Auth.*, 492 F. App'x 567, 569 (6th Cir. 2012).

[3] An "agency" includes "any corporation . . . that is authorized by law to appropriate property in the courts of this state." O.R.C. § 163.01(B), (C).

3

The law does not define "public use," but it does give examples of forbidden uses. *See* O.R.C. § 163.01(H)(1)(a) ("'Public use' does not include any taking that is for conveyance to a private commercial enterprise, economic development, or solely for the purpose of increasing public revenue, unless the property is conveyed or leased to . . . a public utility, municipal power agency, or common carrier.").

Before an agency may appropriate property, it must provide the affected property owner with a "Notice of Intent to Acquire." O.R.C. §§ 163.04, 163.041. The Notice must:

- inform the property owner that the agency needs the property to accomplish a specific project;

- include a written, good-faith offer to purchase "based on [the agency's] determination of the fair market value";

- advise the property owner that she need not accept the offer, but that, if the parties cannot agree on terms, the agency "may have to exercise [its] eminent domain authority to appropriate [the] property"; and

- tell the property owner that she has the right to challenge in a court proceeding "whether the project is necessary," "whether the project is a public use," and "whether the agency's offer reflects the fair market value of the property."

O.R.C. § 163.041.

If the parties cannot agree on terms, the agency may file a verified petition for appropriation in the common pleas court. O.R.C. §§ 163.04(D), 163.05. The petition must identify the piece of land the agency wants to appropriate, state that "the appropriation is necessary [and] for a public use," and describe the appropriation's purpose. O.R.C. § 163.05(A), (B)(1), (C).

The property owner may then file an answer. O.R.C. § 163.08.

If the owner wants to challenge "[t]he agency's right to make the appropriation, the inability of the parties to agree, [or] the necessity for the appropriation," she must specifically deny those

4

matters and set forth a factual basis for the denial. If the owner fails to do so, the court "shall resolve[ ]" those matters "in favor of the agency." *Id.*

If the property owner makes a specific denial, the court must hold a hearing within fifteen days. O.R.C. § 163.09(B)(1).

By filing an answer, the property owner puts the burden on the agency to establish by a preponderance of the evidence that the appropriation is justified. *Id.*; *see also* O.R.C. § 163.021(A) ("the taking agency shall show by a preponderance of the evidence that the taking is necessary and for a public use"). But if the appropriating agency has passed a resolution "declaring the necessity for the appropriation," a rebuttable presumption arises that the appropriation is, in fact, necessary. O.R.C. § 163.09(B)(1)(a).

At the hearing, the necessity of the appropriation is a question for the court to decide. O.R.C. § 163.09(B)(2). Either side may immediately appeal the court's ruling on the necessity and public-use questions. O.R.C. § 163.09(B)(2), (3).

If the court finds that the appropriation is authorized, it holds a jury trial to determine the amount of compensation. O.R.C. § 163.09(B)(2). The agency may not take possession of the property until it "deposits with the court the amount of the award and the costs assessed against the agency." O.R.C. § 163.15.

### 2. Elimination of State Regulatory Oversight of Private Pipeline Companies

Before the Ohio General Assembly passed Senate Bill 315, in 2012, a company that wanted to build a pipeline in Ohio needed to obtain a certificate of approval from the Ohio Power Siting Board. O.R.C. § 4906.04.

5

"In Ohio, the primary regulatory agencies with oversight of pipelines in general are the Ohio Power Siting Board . . . and the Public Utilities Commission of Ohio." Krieger, *Gathering and Transporting Marcellus and Utica Shale Natural Gas to the Market and the Regulation of Midstream Pipelines – The Case for a Uniform Federal and State Definition of "Gathering" in the Context of Economic and Siting Regulation*, 19 Tex. Wesleyan L. Rev. 49, 64 (2012).

The Power Siting Board has jurisdiction over so-called "major utility facilities."

Before 2012, a "major utility facility" referred to:

(1)     Electric generating plant and associated facilities designed for, or capable of, operation at a capacity of fifty megawatts or more;

(2)     An electric transmission line and associated facilities of a design capacity of one hundred twenty-five kilovolts or more; and

(3)     A gas or natural gas transmission line and associated facilities designed for, or capable of transporting gas or natural gas at pressures in excess of one hundred twenty-five pounds per square inch.

O.R.C. § 4906.01(B)(1)–(3) (Baldwin 2011).

To obtain a certificate to build a major utility facility, a company must submit an application that, *inter alia*: 1) describes the facility's location; 2) summarizes any environmental-impact studies that have been conducted; 3) explains why the facility is needed; and 4) states why the proposed location is "best suited for the facility." O.R.C. § 4906.06(A)(1)–(4).

The application goes, not only to the Siting Board, but also to "the chief executive officer of each municipal corporation and county, and the head of each public agency charged with the duty of protecting the environment or of planning land use, in the area in which any portion of such facility is to be located." O.R.C. § 4906.06(B).

6

The entity must also give "public notice to persons residing in the municipal corporations" in which the facility will be located *via* "publication of a summary of the application in newspapers of general circulation[.]" O.R.C. § 4906.06(C).

Within sixty to ninety days of the application's filing, the Siting Board holds a hearing on the application, with the proceedings to be conducted "as expeditiously as possible." O.R.C. § 4906.06(D). The parties to the hearing include the company building the facility, the government officials entitled to the notice described above, and any person residing in the affected municipal corporations or counties. O.R.C. § 4906.08(A)(1)–(3).

The Board "shall not grant a certificate . . . unless it finds and determines all of the following":

- the basis of the need for the facility;

- the nature of the probable environmental impact;

- that the facility represents the minimum adverse environmental impact, considering the state of available technology and the nature and economics of the various alternatives, and other pertinent considerations; and

- that the facility will serve the public interest, convenience, and necessity.

O.R.C. § 4906.10(A)(1)–(3), (6).

In 2012, the General Assembly amended the definition of "major utility facility" by excluding "[n]atural gas liquids finished product pipelines." O.R.C. § 4906.01(B)(1)(g).

A "[n]atural gas liquids finished product pipeline[ ]" is one "that carries finished product natural gas liquids to the inlet of an interstate or intrastate finished product natural gas liquid transmission pipeline, rail loading facility, or other petrochemical or refinery facility." O.R.C. § 4906.01(B)(1)(F).

The term "finished product natural gas liquids" means "an individual finished product produced by a natural gas liquids fractionation plant as a liquid that meets the specifications for commercial products as defined by the gas processors association" and includes "ethane, propane, iso-butane, and natural gasoline." O.R.C. § 4906.01(J).

Thus, a pipeline like the Utopia, which will transport ethane, is outside the Siting Board's jurisdiction.

This is not to say, however, that Kinder Morgan operates without any regulatory oversight.

The company represents, for example, that it has obtained or applied for "environmental and regulatory permits and/or approvals from . . . the U.S. Army Corps of Engineers, U.S. Fish and Wildlife Service, Ohio Department of Natural Resources and Ohio Environmental Protection Agency." (Doc. 9 at 6). Furthermore, the Federal Energy Regulatory Commission has approved the Utopia's initial rates and tariffs. State-Court Petition at ¶11.

### C. The Proposed Appropriations

On June 10, 2016, Kinder Morgan issued Notices of Intent to Acquire to plaintiffs Gordon Cox, Diana Cox, and MHC East, LLC. (Docs. 1–1, 1–2). Despite good-faith negotiations, the parties were unable to come to terms on the proposed easements and rights-of-way.

Accordingly, on August 2, Kinder Morgan filed in the Common Pleas Court of Wood County, Ohio a verified petition to appropriate and condemn an easement across the Coxes' property.

The petition alleged that the Utopia was "necessary and for a public use" because the pipeline would respond to demand for take-away capacity, support the overall development of domestic energy supplies, and enhance the reliability of the interstate pipeline grid. State-Court Petition at ¶12.

8

It also alleged that the taking was "presumed for a public use" because Kinder Morgan is a "common carrier" under § O.R.C. 1723.08. *Id.* at ¶40.

Kinder Morgan attached to the petition a resolution it had issued declaring "there is a public need for, and the public convenience and necessity require, the construction and operation" of the Utopia Pipeline. (Doc. 1–4 at 19). The resolution further declared that "it is necessary and required . . . that the Company acquire land, perpetual easements and temporary construction and work space easements and access rights" across various properties in fourteen Ohio counties. (*Id.*).

### D. Section 1983 Litigation

On July 19, 2016 – after the plaintiffs received the Notices of Intent to Acquire, but before Kinder Morgan filed the State-Court Petition – plaintiffs brought this § 1983 action.

They allege that "Ohio's eminent domain statutes purport to invite purely private corporations to determine their own routes . . . while simultaneously (a) providing no public oversight over those routing decisions; (b) vesting eminent domain authority in these entities; and (c) rendering these private and self-interested routing decision[s] effectively unreviewable[.]" (Doc. 1 at ¶87).

Plaintiffs also argue that § 163.09(B)(1)(a), which establishes a rebuttable presumption that an agency's taking is "necessary," is unconstitutional.

The complaint seeks a declaratory judgment that §§ 163.01 and 1723.01 are unconstitutional "when applied for the benefit of private ethane pipelines such as the Kinder Morgan Utopia Pipeline[.]" (Doc. 1 at 19). They also ask that I enjoin Kinder Morgan from "directly applying R.C. 1723.01 *et seq.*, and R.C. 163.01 *et seq.* for the purpose of constructing the Utopia Pipeline." (*Id.*).

**Standard of Review**

When deciding whether to issue a preliminary injunction, I must balance four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Wilson v. Gordon*, 822 F.3d 934, 952 (6th Cir. 2016).

"When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc).

In addition to arguing that plaintiffs are not entitled to injunctive relief under these factors, Kinder Morgan contends that I should abstain from taking any action in this case. I first address that contention and then turn to the merits of plaintiffs' motion.

**Discussion**

**A. Abstention**

Kinder Morgan argues that I should abstain from adjudicating plaintiffs' claims for two reasons: 1) in light of the provisions of the Anti-Injunction Act, 28 U.S.C. § 2283; and 2) through application of *Younger* abstention.

**1. The Anti-Injunction Act**

The Anti-Injunction Act provides that "[a] court of the United States may not grant an injunction to stay proceedings in state court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction or to protect or effectuate its judgments." 28 U.S.C. § 2283.

10

Long ago, however, the Supreme Court held that "§ 1983 is an Act of Congress that falls within the 'expressly authorized' exception" of the Anti-Injunction Act. *Mitchum v. Foster*, 407 U.S. 225, 243 (1972).

Given that plaintiffs are proceeding under § 1983, and that their due-process claim is cognizable under that statute, the Anti-Injunction Act does not apply.

### 2. *Younger* Abstention

Kinder Morgan next argues that I must abstain under *Younger v. Harris*, 401 U.S. 37 (1971), and its progeny.

The *Younger* rule forbids federal courts to enjoin "a parallel, pending state criminal proceeding." *Sprint Commc'ns, Inc. v. Jacobs*, --- U.S. ---, 134 S. Ct. 584, 588 (2013).

*Younger* also requires that federal courts abstain from interfering with "noncriminal judicial proceedings when important state interests are involved." *Middlesex Cnty. Ethics Comm'n v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). Abstention may therefore be warranted if a federal plaintiff is involved in "'civil enforcement proceedings'" in state court or in "'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Sprint Commc'ns*, *supra*, --- U.S. at ---, 134 S. Ct. at 589 (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 367–68 (1989)).

"There are three requirements for proper invocation of *Younger* abstention: (1) there must be on-going state judicial proceedings; (2) those proceedings must implicate important state interests; and (3) there must be an adequate opportunity in the state proceedings to raise constitutional challenges." *Squire v. Coughlan*, 469 F.3d 551, 555 (6th Cir. 2006) (internal quotation marks omitted).

11

"[W]hen determining whether state court proceedings involving the plaintiffs are pending, we look to see if the state court proceeding was pending at the time the federal complaint was filed." *Loch v. Watkins*, 337 F.3d 574, 578 (6th Cir. 2003); *accord Sun Refining & Marketing Co. v. Brennan*, 921 F.2d 635, 639 (6th Cir. 1991).

Here, plaintiffs filed the federal complaint on July 19, 2016, but Kinder Morgan did not file the Wood County appropriation action until August 2, 2016. There was thus no "ongoing state court proceeding" that would require me to abstain.

Kinder Morgan insists, however, that appropriation proceedings began on June 10, when it issued the Notices of Intent to Acquire.

This argument has no merit.

"According to the Supreme Court, a judicial [proceeding is one that] 'investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist." *BB & T Servs., Inc. v. Ohio Dep't of Ins.*, 2006 WL 314495, *3 (S.D. Ohio) (quoting *New Orleans Pub. Serv., Inc.*, *supra*, 491 U.S. at 370).

The Notices of Intent did not commence this kind of judicial proceeding; they simply opened negotiations. *Cf. City of Toledo v. Beazer Materials & Servs., Inc.*, 923 F. Supp. 1013, 1020 (N.D. Ohio 1996) (Thomas, J.) (agency has no power to appropriate land unless it first negotiates with property owner).

The Notices themselves contemplate that the parties may come to terms on the appropriation without any need for court intervention. They contain offers to purchase, advise the property owners that Kinder Morgan is willing to discuss the offer at any time, and state only that the company "may" exercise its right to appropriate the property at some undefined date in the future.

12

This sort of pre-suit demand letter did not get the appropriation action underway.

Ohio law reinforces that conclusion. *O'Neill v. Coughlan*, 436 F. Supp. 2d 905, 908 (N.D. Ohio 2006) (Aldrich, J.) ("the first prong of *Younger* is dependent on state law characterization of [the] proceedings").

Chapter 163 of the Revised Code treats the Notices as preconditions to filing an appropriation suit, rather than as a mechanism for commencing that action. *See* O.R.C. § 163.04(A) ("At least thirty days before filing a petition pursuant to section 163.05 of the Revised Code, an agency shall provide notice to the owner of the agency's intent to acquire the property."); O.R.C. § 163.041 ("Before initiating an appropriation action, an agency shall provide notice to each property owner"); O.R.C. § 163.05 ("An agency that has met the [notice] requirements of section 163.04 and 163.041 of the Revised Code, may commence proceedings in a proper court by filing a petition for appropriation[.]").

For these reasons, I find that the Notices of Intent to Acquire did not commence a judicial proceeding. Abstention is therefore unwarranted.[4]

### B. Likelihood of Success on the Merits

To state a claim under § 1983, the plaintiffs must allege "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law." *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).

---

[4] I am not convinced that it would be proper to abstain even if there had been a state-court proceeding pending on July 19. The Supreme Court's decision in *Sprint Commc'ns*, *supra*, which Kinder Morgan did not discuss, "set aside the traditional [three-factor] test for applying *Younger*." *Minette v. Minette*, --- F. Supp. 3d ----, 2016 WL 491832, *5 (S.D. Ohio). After *Sprint Commc'ns*, abstention in a civil case is warranted only if the civil case either is an "enforcement proceeding[ ]" or "involv[es] certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions[.]" This case does not appear to fall into either category.

### 1. State Action

"A private entity . . . can be held to constitutional standards when its actions so approximate state action that they may be fairly attributable to the state." *Wilcher v. City of Akron*, 498 F.3d 516, 519 (6th Cir. 2007).

Under this "public functions" test, the law deems a private actor that "exercise[s] powers which are traditionally exclusively reserved to the state, such as holding elections or eminent domain," to be a state actor. *Id.*

Because Kinder Morgan is exercising the State of Ohio's eminent-domain powers, it is a state actor under the "public functions" test. *E.g.*, *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352–53 (1974) (recognizing that eminent domain is a "power . . . traditionally associated with sovereignty"); *Manley v. Paramount's Kings Island*, 2007 WL 4083260, *6 (S.D. Ohio) ("courts have interpreted the public function test narrowly, finding that only functions such as holding elections, exercising eminent domain, and operating a company-owned town fall within this category of state action").

### 2. The Private Nondelegation Doctrine

"The Due Process Clause of the Fourteenth Amendment limits the manner and extent to which legislative authority may be delegated to private parties." *Ctr. for Powell Crossing, LLC v. City of Powell, Ohio*, --- F. Supp. 3d ----, 2016 WL 1165355, *24 (S.D. Ohio) (citing *Biener v. Calio*, 361 F.3d 206, 216 (3d Cir. 2004)).

This limitation, which courts sometimes refer to as the "private nondelegation doctrine," *Kiser v. Kamdar*, --- F.3d ----, 2016 WL 4150918, *6 (6th Cir.), has its origins in *Eubank v. Richmond*, 226 U.S. 137 (1912), and *Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116 (1928).

14

In *Eubank*, *supra*, 226 U.S. at 141, the Court struck down an ordinance that allowed "the owners of two thirds of property abutting on any sitting street" to establish a setback line. The setback line was final, the Court emphasized, meaning that there was "no discretion in the committee on streets as to whether the street line shall or shall not be established in a given case." *Id.* at 143.

Because the ordinance allowed an interested set of property owners to regulate how others used their own property, the Court held that the law violated the Due Process Clause:

> One set of owners determines not only the extent of use, but the kind of use which another set of owners may make of their property. In what way is the public safety, convenience, or welfare served by conferring such power? The statute and ordinance, while conferring the power on some property holders to virtually control and dispose of the property rights of others, creates no standard by which the power thus given is to be exercised; in other words, the property holders who desire and have the authority to establish the line may do so solely for their own interest, or even capriciously.

*Id.* at 143–44.

In *Roberge*, *supra*, 278 U.S. at 118, a zoning ordinance permitted the construction of a "philanthropic home for children or old people," but gave an absolute veto over such a project to one-third of the property owners "within four hundred (400) feet of the proposed building."

The Court struck this ordinance down as well, explaining that the absence of any mechanism by which the affected property owner could challenge the adjacent landowners' decision-making process violated the Fourteenth Amendment:

> The section purports to give the owners of less than one-half the land within 400 feet of the proposed building authority – uncontrolled by any standard or rule prescribed by legislative action – to prevent the trustee from using its land for the proposed home. The superintendent is bound by the decision or inaction of such owners. There is no provision for review under the ordinance; their failure to give consent is final. They are not bound by any official duty, but are free to withhold consent for selfish reasons or arbitrarily and may subject the trustee to their will or caprice. The

15

delegation of power so attempted is repugnant to the due process clause of the Fourteenth Amendment. *Eubank v. Richmond*, 226 U.S. 137, 143[.]

*Id.* at 122 (some internal citations omitted).

As Judge Graham recently explained, "*Eubank* and *Roberge* 'stand for the proposition that a legislative body may not constitutionally delegate to private parties the power to determine the nature of rights to property in which other individuals have a property interest, without supplying standards to guide the private parties' discretion." *Ctr. for Powell Crossing*, *supra*, --- F. Supp. 3d at ----, 2016 WL 1165355, at *25 (quoting *Gen Elec. Co. v. New York State Dep't of Labor*, 962 F.2d 1448, 1455 (2d Cir. 1991)); *see also City of Eastlake v. Forest City Enters., Inc.*, 426 U.S. 668, 678 (1976) (*Eubank* and *Roberge* condemned "the standardless delegation of power to a limited group of property owners").

"The best reading of these cases," a commentator has noted, "suggests that the basic *Eubank* due process rule against delegating mandatory authority to private parties without protection against self-interested decisionmaking continues to this day." Volokh, *The New Private-Regulation Skepticism: Due Process, Non-Delegation, and Antitrust Challenges*, 37 Harv. J. L. & Pub. Pol'y 931, 951 (2014).

Despite the vintage of *Eubank* and *Roberge,* the Sixth Circuit recently cited them with approval while observing that the "private nondelegation doctrine remains vital." *Kiser*, *supra*, --- F.3d at ----, 2016 WL 4150918, at *6.

### a. Parties' Arguments

Plaintiffs argue that the delegation of eminent-domain authority to Kinder Morgan is an unconstitutional delegation of legislative authority.

16

They contend that, by virtue of O.R.C. §§ 163.01 and 1723.01, Kinder Morgan, "a private entity, is rendered a judge of the necessity of its own route, and that judgment is not subject to effective review in state court." (Doc. 1 at ¶32). Plaintiffs complain, in particular, that Ohio law "provides no clarification as to when private property may be 'deemed necessary'" by a private company that intends to build a pipeline. (*Id.* at ¶34) (quoting O.R.C. § 1723.01).

They also maintain that Kinder Morgan, a for-profit enterprise with a duty to maximize profits, has a financial interest in selecting the cheapest route for the Utopia project, and thus standards are necessary to protect the rights of property owners subject to the company's eminent-domain authority.

Kinder Morgan's response to the motion for a temporary restraining order does not address these arguments. Instead, the company tries to reframe the plaintiffs' due-process claim as a claim under the Takings Clause of the Fifth Amendment. (Doc. 8 at 11).

To that end, the company argues that plaintiffs cannot show a likelihood of success because: 1) Kinder Morgan is a common carrier, and "the Supreme Court has previously found eminent domain constitutional when exercised by common carriers"; and 2) the proposed takings of plaintiffs' property are for a public use because they have a "rational connection to a minimally plausible conception of the public purpose." (*Id.* at 12).

In its motion to dismiss, however, Kinder Morgan does address the due-process claim.

The company argues that no due-process violation occurred because Ohio law requires a court to approve its proposed appropriations of plaintiffs' property. (Doc. 9 at 7). Kinder Morgan also argues plaintiffs have the right to appeal in state court, and it emphasizes that "Ohio provides for an adequate opportunity for plaintiffs to raise federal constitutional claims." (*Id.* at 8).

17

### b. Analysis

### (1). This Is Not a Takings Case

At the outset, I reject Kinder Morgan's argument that, simply because the takings at issue might survive a Fifth Amendment challenge, plaintiffs' due-process attack on the process that precedes the takings necessarily fails.

Plaintiffs did not plead a Takings Clause claim (Doc. 1 at ¶¶69–107), and they have stated plainly that they "are *not seeking compensation*" for the proposed takings. (Doc. 11 at 22) (emphasis in original). Whether the takings would survive a Fifth Amendment challenge is therefore beside the point.

Moreover, *Kelo v. City of New London*, 545 U.S. 469 (2005), cannot bear the weight that Kinder Morgan places on it.

To be sure, the Court stated in *Kelo* that "a State may transfer property from one private party to another if future 'use by the public' is the purpose of the taking; the condemnation of land for a railroad with common-carrier duties is a familiar example." *Id.* at 477. But in saying so the Court was merely explaining why a forced transfer of property, *via* a State's eminent-domain power, from one private party to another does not necessarily violate the Fifth Amendment's Public Use Clause. The Court did not purport to decide that all delegations of eminent-domain power to private entities, and all exercises of that authority by private parties, are constitutional.

### (2). Kinder Morgan's Eminent-Domain Power Likely Does Not Violate the Nondelegation Doctrine

Though Kinder's Takings Clause detour gets nowhere, I conclude the more direct approach to plaintiffs' demand for injunctive relief is by way of the element of likelihood of success.

18

I conclude that plaintiffs are unlikely to prevail on their impermissible-delegation claim. This is because the courts of Ohio will undertake judicial review of Kinder Morgan's exercise of its eminent-domain powers. That means that the company cannot take property over an objection without obtaining judicial approval of the appropriation.

This critical fact distinguishes the case from *Roberge*, *Eubank*, and *Ctr. for Powell Crossing*, on which the plaintiffs rely.

In each of those cases, the delegation of legislative power to the private actor was "final" in the sense that, once the private party acted, no governmental body could alter or amend its course of action. *Eubank*, *supra*, 226 U.S. at 143 (ordinance "leaves no discretion in the committee on streets as to whether the street line shall or shall not be established in a given case"); *Roberge*, *supra*, 278 U.S. at 122 ("There is no provision for review under the ordinance; [the adjacent property owners'] failure to give consent is final."); *Ctr. for Powell Crossing*, *supra*, --- F. Supp. 3d at ----, 2016 WL 1165355, *26 (striking down amendment to city charter that authorized a commission composed entirely of private citizens to draft comprehensive zoning plan because, *inter alia*, the amendment "leaves no room for independent fact-finding or rule-making by City Council; it is the [private] Commission who establishes the findings, policies, guidelines and standards by which all zoning ordinances must comply").

Because Ohio law does not delegate that kind of "final" legislative power to Kinder Morgan, plaintiffs are unlikely to prevail on their nondelegation claim.

### (3). The Rebuttable Presumption of Necessity Is Likely Constitutional

Plaintiffs argue, though, that the prospect of judicial review in this instance in illusory. According to them,  the presumption of necessity in O.R.C. § 163.09(B)(1)(a) "impermissibly tie[s]

the hands of state judges through commanding rote deference to private self-interested actors such as Kinder Morgan." (Doc. 4 at 28). They argue that this provision unfairly "*reverses the burden of proof*, demanding that the innocent property owner prove why *he or she should be able to keep his or her land*." (*Id.* at 28–29) (emphasis in original).

Kinder Morgan responds that the presumption is valid because "there is 'a rational connection between what is proved [and] what is to be inferred.'" (Doc. 9 at 11) (quoting *Western & A.R.R. v. Henderson*, 279 U.S. 639, 642 (1929)). The company contends it is rational to presume the necessity of a given appropriation, as determined by a private pipeline company, because "Ohio depends on private entities to develop technology and infrastructure to power and develop Ohio's natural resources." (*Id.*).

Having considered these arguments, I do not believe that the plaintiffs' challenge to § 163.09(B)(1)(a) and their argument about the inefficacy of judicial review is likely to succeed.

First, it bears emphasizing that Ohio law, in permitting property owners even to challenge the necessity of a taking, extends more process, and more protection, than the federal Constitution requires:

> It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of public purpose has been decided, the amount and character of the land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch.

*Berman v. Parker*, 348 U.S. 26, 35–36 (1954); *accord Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 240 (1984) ("Once the object is within the [eminent-domain] authority of Congress, the means by which it will be attained is also for Congress to determine."); *Ledford v. Corp. of Eng'rs of U.S.*, 500 F.2d 26, 28 (6th Cir. 1974) ("Once a court decides that the taking of property is for a public use,

20

then the judicial function is exhausted, and the extent, amount, or title of property to be taken lies within administrative determination, subject only to the requirement that just compensation be paid."); *2,953.15 Acres of Land, More or Less, in Russell Cnty., Alabama v. U.S.*, 350 F.2d 356, 360 (5th Cir. 1965) ("This Circuit has repeatedly recognized that the courts have no jurisdiction to review the legislative or administrative discretion as to the extent of the right, interest or estate in property to be taken."); *Joiner v. City of Dallas*, 380 F. Supp. 754, 764 (N.D. Tex. 1974) (recognizing that Supreme Court "has . . . denied to land-owners the right to participate in th[e] decision-making process" regarding the necessity of a given taking), *aff'd* 419 U.S. 1042 (1974) (mem.).

Second, given that necessity is a question ordinarily reserved to legislative or administrative prerogatives, it is not irrational for a State that has elected to open that question to challenge to show some deference to the appropriating agency's judgment. *Cf. Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 28 (1976) ("The process of making the determination of rationality is, by its nature, highly empirical, and in matters not within specialized judicial competence or completely commonplace, significant weight should be accorded the capacity of Congress to amass the stuff of actual experience and cull conclusions from it.").

The Ohio laws at issue embody a legislative judgment that, as Kinder Morgan points out, private entities are a necessary partner as the State works to exploit "the natural gas boom in the Utica and Marcellus Shale regions[.]" *Dodd v. Croskey*, 143 Ohio St. 3d 293, 293 (2015).

Implicit in the delegation of eminent-domain authority to private pipeline companies, it seems to me, is a recognition that such companies have a particular expertise in these matters. The presumption of necessity shows appropriate deference to that expertise; its rebuttable nature enables property owners to challenge that judgment.

Third, a presumption in a civil case violates the Due Process Clause only if it is arbitrary or does not give litigants a fair opportunity to rebut it. *Henderson*, *supra*, 279 U.S. at 642.

Here, the legal effect of § 163.09(B)(1)(a) is simply to require an objecting property owner to produce some evidence on the necessity question. It thus permits a court to presume that a taking is necessary only in the absence of any contradictory evidence; should the property owner introduce evidence on that question, the presumption would dissolve and the burden return to Kinder Morgan. *See Mobile, Jackson & Kansas City R. Co. v. Turnipseed*, 219 U.S. 35, 43 (1910).

Plaintiffs' further argument that they will be unable to mount an effective challenge to the necessity of a given taking or the Utopia Pipeline as a whole is premature and conclusory. (Doc. 11 at 11–18).

As the entity that designed and intends to build the pipeline, Kinder Morgan is, as plaintiffs emphasize, in the best position to justify the appropriations it seeks. But plaintiffs' burden under § 163.09(B)(1)(a) is not to prove that the appropriation of their property is unnecessary; it is merely to introduce some evidence to that effect, such that the presumption of necessity would cease to favor Kinder Morgan and the company would need to justify, to the court, the necessity of its proposed takings.

Plaintiffs' briefs hint, moreover, at likely attacks they could make on Kinder Morgan's declaration of necessity, and I will not presume that there are no possible arguments plaintiffs could make to show the appropriations are not necessary.[5]

---

[5] To the extent plaintiffs may face an uphill battle in contesting the "necessity" question, it is Ohio law's broad definition of that term, *see Bd. of Trustees of Sinclair Cmty. Coll. Dist. v. Farra*, 2010-Ohio-568, ¶37 (Ohio App.), rather than § 163.09(B)(1)(a), that appears primarily responsible.

22

Finally, the presumed fact – that a given appropriation is necessary – bears a rational relationship to the proved fact – that the appropriating agency has passed a resolution declaring the appropriation necessary. Again, the presumption simply gives effect to the private entity's superior knowledge and judgment, as manifested in the resolution, that a given taking is necessary, all while allowing plaintiffs a fair chance to rebut it.

Accordingly, plaintiffs are unlikely to prevail on their claim that § 163.09(B)(1)(a) is unconstitutional.

### C. Irreparable Injury

Plaintiffs' failure to show that they are likely to succeed on their claim is enough to deny their motion for a temporary restraining order. *City of Pontiac*, *supra*, 751 F.3d at 430.

Nevertheless, I also conclude that issuing a temporary restraining order is not necessary to ensure that plaintiffs avert irreparable injury.

The judicial review available to the plaintiffs in the Wood County litigation will protect their rights and ensure that the appropriation conforms to Ohio law. In that litigation, moreover, the plaintiffs may raise the same challenge that they have raised here, in addition to questioning Kinder Morgan's right to appropriate their property, the necessity of the taking, and its alleged public use.

Finally, the plaintiffs have the ability to raise claims under the Ohio Constitution's Public Use Clause, which is considerably more protective of property owners' rights than the federal Constitution. *See City of Norwood v. Horney*, 110 Ohio St. 3d 353, 355–56 (2006) (rejecting *Kelo* and holding that "the fact that the appropriation would provide an economic benefit to the

government and community, standing alone, does not satisfy the public-use requirement of Section 19, Article I of the Ohio Constitution").[6]

### Conclusion

Because plaintiffs do not have a strong likelihood of prevailing, and have not established an irreparable injury, it is hereby ORDERED THAT plaintiffs' motion for a temporary restraining order (Doc. 4) be, and the same hereby is, denied.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

---

[6] Indeed, the court in *Horney*, *supra*, 110 Ohio St. 3d at 391 n.16, recognized that, as a matter of Ohio constitutional law, "there are significant questions about the validity of the presumption in favor of the state that is set forth in R.C. 163.09(B)[.]" As these concerns ultimately stem from the Ohio Constitution's Public Use Clause, they do not affect my analysis of plaintiffs' claims under the Fourteenth Amendment.